804 S.E.2d 883

**Patrick MORRISEY, in his official capacity as West Virginia Attorney General, and The State of West Virginia, Defendants Below, Petitioners**

v.

**WEST VIRGINIA AFL-CIO, et al., Plaintiffs Below, Respondents**

**No. 17-0187**

Supreme Court of Appeals of West Virginia.

Submitted: September 5, 2017

Filed: September 15, 2017

Concurring and Dissenting Opinion of Justice Workman
September 19, 2017

Dissenting Opinion of Justice Davis
October 2, 2017

---

John D. Hoblitzell, III, Esq., Kay Casto & Chaney, PLLC, Charleston, West Virginia, Counsel for The Honorable James C. Justice, in his Official Capacity as Governor of the State of West Virginia

Maneesh Sharma, Esq., Washington, District of Columbia, Thomas P. Maroney, Esq., Maroney Williams Weaver & Pancake PLLC, Charleston, West Virginia, Counsel for Amicus Curiae American Federation of Labor and Congress of Industrial Organizations

Jeffrey G. Blaydes, Esq., Carbone & Blaydes, P.L.L.C., Charleston, West Virginia, Counsel for Amici Curiae West Virginia Employment Law Association and West Virginia Association for Justice

Justice Ketchum:

In this appeal, we examine a preliminary injunction issued by the Circuit Court of Kanawha County that stopped the implementation of West Virginia's new "right to work" law. In limited circumstances, a circuit court may issue a preliminary injunction when the plaintiff shows that his or her lawsuit is likely to succeed on its merits.

The plaintiffs in this case are several unions. The gist of their argument is that the right to work law is unconstitutional because it is unfair to unions and union members. The defendants are officials for the State of West Virginia. Their argument is that the law is fair because it protects workers who do not want to join or pay dues to a union.

Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, Thomas M. Johnson, Jr., Deputy Solicitor General, Gilbert Dickey, Assistant Attorney General, Charleston, West Virginia, Counsel for the Petitioners

Vincent Trivelli, Esq., The Law Office of Vincent Trivelli, Morgantown, West Virginia, Robert M. Bastress, Jr., Esq., Morgantown, West Virginia, Counsel for the Respondents

Matthew B. Gilliam, Esq., National Right to Work Legal Defense Foundation, Inc., Springfield, Virginia, Counsel for Amici Curiae National Right to Work Legal Defense and Education Foundation, Inc., and Reginald Gibbs

Derk A. Wilcox, Esq., Mackinac Center for Public Policy, Mackinac Center Legal Foundation Midland, Michigan, Danielle Waltz, Esq., Jackson Kelly PLLC, Charleston, West Virginia, Counsel for Amicus Curiae Mackinac Center for Public Policy

■ Whether a law is fair or unfair is not a question for the judicial branch of government. Courts cannot dwell "upon the political, social, economic or scientific merits of statutes[.]" [1] The wisdom, desirability, and fairness of a law are political questions to be resolved in the Legislature. Those decisions may only be challenged in the court of public opinion and the ballot box, not before the judiciary. Our duty boils down to weighing whether the preliminary injunction was proper, and whether the unions showed they are

1. Syllabus Point 2, in part, *Huffman v. Goals Coal Co.*, 223 W.Va. 724, 725, 679 S.E.2d 323, 324 (2009).

likely to prevail in their ultimate claim that the law is unconstitutional.

As we discuss below, we find that the unions failed to show a likelihood of success in their legal challenge to the law's constitutionality. Twenty-eight states, including West Virginia, have a right to work law, yet the unions have not directed us to any federal or state appellate court that, in over seven decades, has struck down such a law. Therefore, the circuit court erred in granting the preliminary injunction.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns a preliminary injunction temporarily halting the implementation of provisions in Senate Bill 1, enacted in the 2016 Regular Session of the West Virginia Legislature.[2] The Legislature euphemistically titled Senate Bill 1 as the "Workplace Freedom Act," and in the same way calls it a "right to work" law.

Similar to right to work laws adopted in twenty-seven other states, Senate Bill 1 amends West Virginia's labor relations laws to change the way unions represent employees in a workplace.[3] First, the bill prohibits a union and an employer from entering a collective bargaining agreement that compels all employees to join the union. Second, the bill eliminates a union's ability to compel nonunion employees to pay any dues, fees, or assessments, of any kind, in exchange for the union's assistance. Nevertheless, when a union assumes representation of a workplace, other federal and state laws require the union to fairly represent all employees in the workplace, even employees who are not union members and have paid no fees to the union.

2. *See 2016 Acts of the Legislature,* ch. 142.

3. *See generally,* W.Va. Code §§ 21-5G-1 to -7 [2016]. We discuss the bill in detail in the discussion below.

4. The plaintiffs are the West Virginia AFL-CIO; the West Virginia State Building and Construction Trades Council, AFL-CIO; the Chauffeurs, Teamsters, and Helpers Local No. 175; the United Mine Workers of America, AFL-CIO; and the

The plaintiffs are several unions who sued various officers of the State of West Virginia to challenge the enforceability of Senate Bill 1.[4] The unions' complaint asserted a hodgepodge of theories.

However, the unions raised three constitutional claims as the basis for seeking a preliminary injunction. The unions maintained that Senate Bill 1 violates the West Virginia Constitution because it impairs the associational rights of unions to consult for the common good; it takes the unions' property without just compensation; and it violates the unions' liberty interests, by requiring unions to expend their labor for nonunion employees without the ability to charge a fee for that labor. The unions argued that, if the law took effect, the unions would be harmed because they would be unable to bargain for compulsory membership and fees in new collective bargaining agreements without potentially violating the law. The unions asked the circuit court to halt implementation of Senate Bill 1 until the merits of the unions' complaint could be resolved.

In an order dated February 24, 2017, the circuit court imposed a preliminary injunction. The circuit court ruled that the provisions of Senate Bill 1 would not go into effect until the circuit court ruled on the merits of the unions' arguments.

The State now appeals the circuit court's preliminary injunction order.

## II.

### STANDARD OF REVIEW

The granting or refusal of an injunction calls for a circuit court to exercise judicial discretion. We apply a three-pronged deferential review to the circuit court's decision. "We review the final order granting the

International Brotherhood of Electrical Workers, AFL-CIO, Locals 141, 307, 317, 466, 596, and 968; and Amanda Gaines, a union member. The defendants included the Governor of the State of West Virginia, originally Earl Ray Tomblin, who was succeeded in January 2017 by James C. Justice; and the Attorney General, Patrick Morrisey. The State of West Virginia subsequently intervened in the suit.

[preliminary] injunction and the ultimate disposition under an abuse of discretion standard, we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law de novo." [5]

## III.

## ANALYSIS

■ A fundamental rule of governance is that courts must presume a law is constitutional unless a party proves, beyond a reasonable doubt, that the law violates the Constitution.[6]

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.[7]

To ultimately succeed in this case, the unions must show beyond reasonable doubt that Senate Bill 1 violates constitutional bounds. Challenges to the constitutionality of a law cannot be made lightly and without concerted, focused effort. Indeed, "One who attacks a statute on constitutional grounds, defended as that statute is by a strong presumption of constitutionality, should bring up his heavy artillery or forego the attack entirely." [8]

■ The unions sought and received a preliminary injunction based upon their constitutional attack upon Senate Bill 1. For many decades, West Virginia courts have applied the following guide when granting or refusing an injunction:

The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ.[9]

The central core of this decades-old analysis is the "comparative hardship" of the parties. The federal courts have evolved a detailed methodology to guide courts in balancing the hardship of the parties. West Virginia trial courts apply this same four-factor methodology when weighing the granting or refusal of a preliminary injunction:

Under the balance of hardship test the district court must consider, in 'flexible interplay,' the following four factors in determining whether to issue a preliminary injunction: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) *the plaintiff's likelihood of success on the merits*; and (4) the public interest.[10]

5. Syllabus Point 1, in part, *State by and through McGraw v. Imperial Marketing*, 196 W.Va. 346, 472 S.E.2d 792 (1996) (citations omitted).

6. Syllabus Point 2, in part, *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 454 S.E.2d 65 (1994) ("Acts of the Legislature are presumed to be constitutional, and courts will interpret legislation in any reasonable way which will sustain its constitutionality."); *State ex rel. City of Charleston v. Coghill*, 156 W.Va. 877, 883, 207 S.E.2d 113, 118 (1973) (same).

7. Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965).

8. *Southern Valley Grain Dealers Ass'n v. Bd. of Cty. Comm'rs of Richland Cty.*, 257 N.W.2d 425, 434 (N.D. 1977).

9. Syllabus Point 4, *State ex rel. Donley v. Baker*, 112 W.Va. 263, 164 S.E. 154 (1932).

10. *Jefferson Cty. Bd. of Educ. v. Jefferson Cty. Educ. Ass'n*, 183 W.Va. 15, 24, 393 S.E.2d 653, 662 (1990) (emphasis added) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985)).

In this appeal, the State's arguments center upon the third factor: the unions' likelihood of success on the merits of their constitutional arguments. The State argues on appeal that the constitutional claims advanced by the unions have been tested before in other courts and rejected. Twenty-seven other states have adopted right to work laws similar to West Virginia's, and the unions have not shown a single one that has been struck down by an appellate court. Moreover, the unions did not plainly articulate to the circuit court which provision of the West Virginia Constitution provides, beyond a reasonable doubt, that a right-to-work law is improper. Because the unions did not demonstrate a likelihood of success, the State argues the circuit court should not have granted a preliminary injunction. We agree.

Congress enacted the National Labor Relations Act[11] (also called the "Wagner Act") in 1935 to protect the rights of employees and employers, and to encourage collective bargaining. Congress amended it through the Labor Management Relations Act of 1947, better known as the "Taft-Hartley Act." Section 8(a)(3) of the Taft-Hartley Act prohibited a "closed shop," a union security agreement whereby an employer agreed to employ only union members.[12] Section 8(a)(3) still permitted "less severe forms of union-security arrangements" such as a union-employer agreement "requiring nonunion members to pay to the union $2 a month 'for the support of the bargaining unit.' "[13] It also permitted a workplace where the employer was free to hire anyone, but could require new employees to join the union after they were hired.[14]

Although Section 8(a)(3) of the Taft-Hartley Act permitted the adoption of such less restrictive union-security agreements, a provision of the Act also left states free to ban them altogether. Section 14(b) of the Act creates an exception to Section 8(a)(3), and provides that states may pass laws that prohibit "agreements requiring membership in a labor organization as a condition of employment[.]"[15] The United States Supreme Court has examined the interplay between Section 8(a)(3) and Section 14(b) and found that "Congress left the States free to legislate" and adopt laws "restricting the execution and enforcement of union-security agreements," and even free to go so far as to "outlaw" a union-security arrangement.[16]

When Congress passed Section 14(b) of the Taft-Hartley Act in 1947, twelve states had right-to-work laws.[17] "These laws fell into two different categories. The first broadly disallowed compulsory union membership. The second included specific provisions outlawing compulsory payment of dues or fees to labor organizations."[18] "Congress knew precisely what state laws it was validating when it passed § 14(b). The House [of Representatives'] report listed each state which had passed a right-to-work law or constitu-

**11.** 29 U.S.C. §§ 151-169.

**12.** Section 8(a)(3) is codified at 29 U.S.C. § 158(a)(3) [1979].

**13.** *N.L.R.B. v. Gen. Motors Corp.*, 373 U.S. 734, 739-40, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). Section 8(a)(3) provides that nothing "shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein[.]" 29 U.S.C. § 158(a)(3).

**14.** *Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U. S. & Canada, Local Unions Nos. 141, 229, 681, & 706 v. N. L. R. B.*, 675 F.2d 1257, 1266-1269 (D.C. Cir. 1982) (Mikva, J. dissenting).

**15.** Section 14(b), codified at 29 U.S.C. § 164(b) [1959], provides:

> (b) *Agreements requiring union membership in violation of State law.* Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

**16.** *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 102-03, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). *See also United Auto., Aerospace & Agric. Implement Workers of Am. Local 3047 v. Hardin Cty., Kentucky*, 842 F.3d 407, 417 (6th Cir. 2016) ("state" in § 14(b) includes political subdivisions).

**17.** *Int'l Union of Operating Engineers Local 370 v. Wasden*, 217 F.Supp.3d 1209, 1221 (D. Idaho 2016).

**18.** *Sweeney v. Pence*, 767 F.3d 654, 662 (7th Cir. 2014).

tional provision."[19] The clear purpose of Section 14(b) "was to preserve the efficacy of laws like these—statutes that allowed states to place restrictions of their choosing on union-security agreements[.]"[20]

■ In sum, under federal law, states may decide whether to allow or prohibit employers and unions to negotiate agreements requiring compulsory union membership, or requiring nonunion employees to pay dues or fees to the union.

In Senate Bill 1, the West Virginia Legislature chose to prohibit both compulsory union membership and compulsory dues for union representation. The bill provides that an employee may not be compelled,

as a condition or continuation of employment, to:

(1) Become or remain a member of a labor organization;

(2) Pay any dues, fees, assessments or other similar charges, however denominated, of any kind or amount to any labor organization; or

(3) Pay any charity or third party, in lieu of those payments, any amount that is equivalent to or a pro rata portion of dues, fees, assessments or other charges required of members of a labor organization.[21]

The bill goes on to declare as "unlawful, null and void, and of no legal effect" any agreement between a labor organization and an employer that requires membership in the organization,[22] and imposes criminal and civil penalties for the adoption of such an agreement.[23]

In the unions' complaint for relief and request for a preliminary injunction, the unions offered the aforementioned three arguments why Senate Bill 1 is unconstitutional. The State counters that the unions have not demonstrated a likelihood of success on the constitutional arguments they have so far advanced. Hence, the State argues that the circuit court abused its discretion in granting the preliminary injunction. We therefore must examine the three constitutional arguments thus far proffered by the unions.

The unions first argue that Senate Bill 1 violates their constitutional right to freedom of association under the West Virginia Constitution.[24] The unions contend that the bill is unconstitutional because it impairs their ability to associate with employees to advance workers' causes.

■ "There is no doubt that union workers enjoy valuable rights of association and assembly that are protected by the First Amendment."[25] However, we see nothing in Senate Bill 1 that prevents a person from making a voluntary choice to associate with a union or to pay union dues. Additionally, the constitutional freedom of association argument proffered by the unions is nearly identical to one rejected by the United States Supreme Court almost seven decades ago. The Supreme Court stated:

The constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly's plans.[26]

The Supreme Court plainly held that the constitutional right to assemble and associate does not entitle a union to compel nonmembers to "participate in union assemblies" as a

19. *Int'l Union of the Plumbing and Pipefitting Indus.*, 675 F.2d at 1260.

20. *Sweeney*, 767 F.3d at 663.

21. W.Va. Code § 21-5G-2 [2016].

22. W.Va. Code § 21-5G-3 [2016].

23. W.Va. Code §§ 21-5G-4 and -5 [2016].

24. The unions base their argument on two constitutional provisions. Article III, § 16 of the West Virginia Constitution provides, "The right of the people to assemble in a peaceable manner, to consult for the common good, to instruct their representatives, or to apply for redress of grievances, shall be held inviolate." Article III, § 7, provides in part, "No law abridging the freedom of speech, or of the press, shall be passed[.]"

25. *Sweeney*, 767 F.3d at 670.

26. *Lincoln Fed. Labor Union No. 19129, A.F. of L. v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 531, 69 S.Ct. 251, 93 L.Ed. 212 (1949).

condition of employment.[27] Likewise, "unions have no constitutional entitlement [under the First Amendment] to the fees of nonmember-employees." [28]

We find no fault with the unions' assertion that membership and dues are the lifeblood of any labor organization. We also find no fault with the State's contention that, just as there is a right for employees and unions to associate, there is a right to not associate.[29] The question we must decide is whether the unions have shown a likelihood of success in pressing their argument that Senate Bill 1 is unconstitutional because it impairs their freedom of association. At least twenty-seven other states have some form of a right to work law today, many in existence since the passage of the Taft-Hartley Act in 1947. The unions have not directed us to any state or federal appellate decision accepting their constitutional freedom of association argument and disapproving of a right to work law on similar grounds.

Put simply, the unions have not established a likelihood that they will ultimately succeed on their contention that Senate Bill 1 violates their constitutional right of association beyond a reasonable doubt.

▉ The second constitutional argument proffered by the unions is that Senate Bill 1 is an unconstitutional taking of union property. Federal and state law requires unions to provide equal services and representation to all employees who are members of a collective bargaining unit.[30] It costs a union money to negotiate, administer and enforce an agreement with an employer. The unions argue that a state law prohibiting the union from collecting fees from nonmembers, while the law requires the union to provide equal services to these "free riders," effects an unconstitutional taking of property.[31]

▉ The State contends that a unilateral expectation of fees is not a constitutionally protected property right. For purposes of due process challenges, "A 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." [32] "A 'property' interest protected by due process must derive from private contract or state law, and *must be more than [a] unilateral expectation....*" [33]

These due process guides are instructive in the context of the alleged taking of a property interest. In the absence of a collective bargaining agreement, unions have only a "unilateral expectation" of receiving fees from nonunion employees. Prior to the passage of Senate Bill 1, unions could only speculate whether they would be able to negotiate new agreements with employers that would require the collection of fees from nonunion employees. The formation of a collective bargaining agreement with a fee-collection provision was contingent upon the consent of a third party: the employer.

**27.** *Id.*

**28.** *Davenport v. Washington Educ. Ass'n,* 551 U.S. 177, 185, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007) (citing *Lincoln Fed. Labor Union,* 335 U.S. at 529-531, 69 S.Ct. 251).

**29.** *Adkins v. Miller,* 187 W.Va. 774, 777, 421 S.E.2d 682, 685 (1992) (quoting *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)).

**30.** *Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 202-03, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (The Railway Labor Act "expresses the aim of Congress to impose on the bargaining representative ... the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them."). *See also Ford Motor Co. v. Huffman,* 345 U.S. 330, 337-38, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (extending duty of fair representation to the NLRA); 29 U.S.C. § 159 ("Representatives designated or selected for the purposes of collective bargaining by the majority of the employees ..: shall be the exclusive representatives of all the employees[.]"; and W.Va. Code § 21-1A-5(a) (same)).

**31.** W.Va. Const., Article III, § 9 ("Private property shall not be taken or damaged for public use without just compensation.")

**32.** Syllabus Point 3, *Waite v. Civil Serv. Comm'n,* 161 W.Va. 154, 241 S.E.2d 164 (1977) (*overruled on other grounds by W.Va. Dep't of Educ. v. McGraw,* 239 W.Va. 192, 800 S.E.2d 230 (2017)).

**33.** Syllabus Point 3, in part, *Orteza v. Monongalia Cty. Gen. Hosp.,* 173 W.Va. 461, 318 S.E.2d 40 (1984) (emphasis added).

Hence, in the absence of an actual collective bargaining agreement, the unions have only a unilateral expectation that they will receive fees from nonunion employees. Senate Bill 1 does not affect existing contracts; it affects only future agreements that unions and employers have not yet negotiated or accepted. The unions therefore have no protected property right that the Legislature has taken through the adoption of Senate Bill 1.

Moreover, the unions have offered no authority that any other appellate court in this country has examined a taking challenge to a right to work law and accepted a similar argument. Hence, we cannot say that the union demonstrated a likelihood of success on their claim that Senate Bill 1, beyond a reasonable doubt, is an unconstitutional taking of union property.

The unions' third and final argument—set forth in a single paragraph—is that Senate Bill 1 deprives them of their liberty interest in their labors. The unions assert that the Constitution safeguards individual "liberty," a concept that includes "the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator" and "the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation." [34] The unions then state that Senate Bill 1 will require unions and union officials to work for nothing, thereby contravening their liberty interest.

The unions failed to develop their legal argument as to how Senate Bill 1 violates a liberty interest under the West Virginia Constitution. This Court routinely rejects skeletal arguments like that offered by the unions.[35] Nevertheless, as with the unions' other two constitutional claims, the union has failed to show that any other appellate court

in this country has adopted a similar argument to strike down a similar right to work law. Hence, on the grounds offered by the unions, we are not persuaded that they established a likelihood of success on their claim that Senate Bill 1 violated their liberty interests.

In the absence of a likelihood of success on the merits, the circuit court abused its discretion when it granted the unions' request for a preliminary injunction. The circuit court's order must be reversed and the case remanded for final resolution.

## IV.

## CONCLUSION

The unions failed to establish a likelihood of success on the merits of their three constitutional claims. The circuit court therefore abused its discretion in granting a preliminary injunction. The circuit court's February 24, 2017, order is therefore reversed, the preliminary injunction dissolved, and the case remanded for the circuit court to conduct a final hearing on the merits of the parties' various contentions.[36]

Reversed and remanded.

CHIEF JUSTICE LOUGHRY concurs and reserves the right to file a separate Opinion.

JUSTICE DAVIS dissents and reserves the right to file a separate Opinion.

JUSTICE WORKMAN concurs, in part, and dissents, in part, and reserves the right to file a separate Opinion.

Loughry, C. J., concurring:

The circuit court's issuance of an injunction in this matter was not merely impru-

---

**34.** *Lawrence v. Barlow,* 77 W.Va. 289, 292, 87 S.E. 380, 381 (1915).

**35.** *See State, Dept. of Health v. Robert Morris N.,* 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995).

**36.** The record indicates the plaintiffs filed their request for a preliminary injunction on June 27, 2016, four days before Senate Bill 1 took effect on July 1, 2016. A hearing on the request was held on August 10, 2016, and a proposed order

was submitted to the circuit court on August 19, 2016. The circuit court only entered the proposed order five months later, on February 24, 2017, after the Attorney General threatened to seek mandamus relief from this Court. Because of the far-reaching effect of Senate Bill 1 and its potentially substantial impact upon public interests, in the future, we encourage the circuit court to act with greater celerity in bringing this case to a resolution.

dent, but profoundly legally incorrect. Not only did the circuit court utilize an overruled legal standard for the issuance of an injunction, it blithely stated that the respondents' constitutional challenge to West Virginia's "right-to-work" law was "likely" to succeed, entitling them to an injunction. In fact, precisely the opposite was, and is, true: in the absence of *any* legal authority supporting its constitutional challenge and in the face of United States Supreme Court holdings undermining their position, the respondents' action fails on all fronts. While the majority opinion largely limits its discussion to the propriety of the injunction and therefore understandably declines a comprehensive discussion of the underlying constitutional challenge, I write separately to demonstrate how fatally unsupported and lacking in merit the respondents' constitutional challenge is, thereby making the circuit court's issuance of an injunction all the more inexplicable.

West Virginia's "Workplace Freedom Act," West Virginia Code § 21–5G–1 to –7 (hereinafter "the Act"), prohibits compulsory union membership and/or compulsory union dues by non-union employees. This Act preserves to the employee whether he or she wishes to participate in the union and prohibits employers from making such membership a condition of employment. The respondents effectively make two constitutional challenges to the Act. First, the respondents claim that the Act infringes on the union's constitutional right of freedom of association under the West Virginia Constitution. Secondly, the respondents claim that the statute effects an unconstitutional taking of union property.

Regarding the freedom of association claim, the respondents assert that by merely allowing employees to *choose* whether to join the union, the Act impairs the union's ability to associate with employees. The United States Supreme Court effectively rejected this argument more than half a century ago. In *Lincoln Federal Labor Union No. 19129, A.F. of L. v. Nw. Iron & Metal Co.*, 335 U.S. 525, 531, 69 S.Ct. 251, 93 L.Ed. 212 (1949), the Supreme Court stated that "[t]he constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly's plans." Upholding North Carolina's and Nebraska's right-to-work laws, the Supreme Court further held: "Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that *legislative protection can be afforded non-union workers.*" *Lincoln Fed.*, 335 U.S. at 537, 69 S.Ct. 251 (emphasis added). The ability of states to prohibit compulsory union membership arose within the federal Taft–Hartley Act, enacted in 1947, which *expressly* provides that states may pass laws that prohibit "agreements requiring membership in a labor organization as a condition of employment[.]" 29 U.S.C. § 164(b). Simply put, just as employees have a constitutionally protected right to assemble and belong to a union, non-union members have a commensurate right *not* to belong to the union. Protecting union members' right to join the union neither requires nor permits compulsory membership for those who choose not to join. Right-to-work laws simply protect the non-member's right to decline union membership.

Turning to the respondents' unconstitutional takings claim, they assert that being forced to engage in labor negotiations in absence of a requirement that all employees be dues-paying union members provides nonmembers with a "free ride." There is little question that this is true; the question is whether this is unconstitutional. It is well-established that a "takings" claim exists only if there is a taking of a *constitutionally protected* property interest. This Court has held that "[a] [constitutionally protected] property interest … must derive from private contract or state law, and must be more than the unilateral expectation [.]" Syl. Pt. 3, *Orteza v. Monongalia Cty. Gen. Hosp.*, 173 W. Va. 461, 462, 318 S.E.2d 40, 41 (1984) (quoting *Major v. DeFrench*, 169 W. Va. 241, 251, 286 S.E.2d 688, 695 (1982)). However, the respondents have absolutely no entitlement to the fees of non-members; in fact, the United States Supreme Court has expressly stated as much: "[U]nions have no constitutional entitlement to the fees of nonmember-employees." *Davenport v. Washington Educ.*

*Ass'n*, 551 U.S. 177, 185, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007). The respondents' expectation of compelling fees from non-members is but a "unilateral expectation" insufficient to create a property interest which is constitutionally protected. Simply stated, merely because the Act preserves a non-member's right and ability to decline to participate in union membership does not mean that the Act has "taken" anything to which the unions were entitled: "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right[.]" *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983).

Were it not enough that the Taft–Hartley Act expressly allows for the states to prohibit compulsory union membership and/or dues remittance, the United States Supreme Court has essentially spoken on all critical aspects of this issue. The Supreme Court has addressed the premises underlying the respondents' challenge, as demonstrated above, but has also dealt with it more directly. In *Retail Clerks International Association, Local 1625, AFL–CIO v. Schermerhorn*, 375 U.S. 96, 102–03, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963), the Supreme Court stated that "even if [a] union-security agreement clears all federal hurdles, the States by reason of [29 U.S.C. 164(b) ] have the final say and *may outlaw it.*" (Emphasis added). That is precisely what the Act does. Although the respondents unavailingly split hairs regarding the scope of *Lincoln Federal*, the Supreme Court could scarcely be clearer than when it held that "[t]here cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employment all other persons who will not or can not, participate in union assemblies." 335 U.S. at 531, 69 S.Ct. 254.

In view of the clarity of the Supreme Court's precedent on the underpinnings of the respondents' constitutional challenge, the Seventh Circuit has rejected arguments identical to the respondents' relative to Indiana's right-to-work law. In *Sweeney v. Pence*, the Court rejected takings and associational constitutional challenges to Indiana's right-to-work law, stating:

> There is no doubt that union workers enjoy valuable rights of association and assembly that are protected by the First Amendment. *See, e.g., Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945). But as in *Lincoln Federal*, that right alone cannot operate as an offensive weapon to wrest rights from others: here, the Hoosier workers whose rights not to associate with the union are protected by the new legislation.

767 F.3d 654, 670 (7th Cir. 2014). Wisely noting that the Taft–Hartley Act, long ago enacted, preserved to the states the ability to enact precisely such laws, the *Sweeney* court observed the quintessentially legislative issues presented by such right-to-work laws and the commensurate limitations of the Court to strike down such legislation:

> [T]he controversy is one that ought to be addressed and resolved at the level of legislative politics, not in the courts. The statutory question posed is whether Indiana's new law is preempted by federal labor law, or threatens the Union's First Amendment rights. The answer is an emphatic no. Right–to–Work laws like Indiana's have existed since before the passage of the Taft–Hartley Act and the inclusion of Section 14(b) of the NLRA. *Congress specifically reserved to the states the power to write and enforce laws of this nature, in accordance with individual states' needs and wisdom. It is not our province to wrest this authority, which has been intact and undisturbed for over sixty-five years, from the states and erase the distinction between right-to-work states and non-right-to-work states.*

*Id.* at 671 (emphasis added).

The clarity of the foregoing leads inexorably to the circuit court's unsubstantiated decision to issue a preliminary injunction. Despite the circuit court's terse and astonishing statement that the respondents had "demonstrated a substantial likelihood of success," it is nevertheless clear that the circuit court granted the injunction under a lax and improper standard. Finding merely that the constitutional challenges were "substantial,

serious, and difficult," the circuit court below incorrectly found that a preliminary injunction may issue if the likelihood of harm to plaintiff outweighed the likelihood of harm to defendant, *i.e.* a "balancing of hardships." Critically, this out-dated standard provides that a plaintiff need not show that he or she is likely to succeed before an injunction may issue. *See Blackwelder Furniture Co. v. Seilig*, 550 F.2d 189, 195 (4th Cir. 1977) ("If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success."). This standard was expressly overruled by the Fourth Circuit in *Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342 (4th Cir. 2009), *cert. granted, judgment vacated on other grounds*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010), *and adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010): "[T]he *Blackwelder* balance-of-hardship test may no longer be applied in granting or denying preliminary injunctions[.]"

Nevertheless, the circuit court relied on this overruled case and repeatedly echoed its now-defunct holding in finding that the constitutional challenges presented were so "substantial, serious, and difficult," a preliminary injunction was warranted. *See Blackwelder*, 550 F.2d at 195 (granting injunction where questions are "so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation"). The circuit court's reliance on *Blackwelder* to circumvent the requirement that the respondents demonstrate a "likelihood of success" was undoubtedly because they could not do so, as demonstrated above. Utilizing such ham-handed tactics to enjoin a presumptively constitutional legislative enactment is unseemly, at best. If nothing more than presenting a "serious, substantial, [and] difficult" question was sufficient to enjoin legislation duly enacted by our elected officials, there would be scarcely *any* legislation that would not be immediately enjoined simply by its opponents offering

up a whisper of a constitutional challenge in court. Opponents of the legislation could then successfully suffocate duly enacted laws with arcane challenges to the laws which languish, unresolved, at the feet of dilatory or recalcitrant judges. The "likelihood of success" is a required element for issuance of a preliminary injunction for the sole purpose of thwarting such efforts and weeding out toothless claims, such as those raised here.

In short, twenty-eight states have a right-to-work law. *None* has been struck down, much less on the grounds advanced by the respondents. United States Supreme Court precedent has effectively rebuffed all of the challenges and subsidiary positions advanced by the respondents. The respondents have demonstrated *no* likelihood of success and their failure was abetted by the circuit court's use of an overruled, effectively meaningless standard for issuance of a preliminary injunction. This monumental failure of legal reasoning was compounded by extraordinary and baseless delay occasioned by the circuit court. Accordingly, I respectfully concur in the majority's reversal of the preliminary injunction and remand for further proceedings. I further encourage the circuit court to assiduously avoid further delay and grant this matter its foremost attention.

WORKMAN, Justice, concurring in part, and dissenting in part:

(Filed September 19, 2017)

The one and *only* issue properly before this Court is whether the circuit court erred in granting a preliminary injunction of the Workplace Freedom Act,[1] also known as the "right to work" law. The law is crystal clear that an appellate court's review of an order granting a preliminary injunction is strictly confined to the limited issue of the propriety of the injunctive relief.[2] Our jurisdiction at this point is *"not to resolve the overall merits of the dispute between the parties[,]"*[3] and *not* to decide the constitutionality of the law until there is a full hearing on these issues below and the entry of a full order capable of

1. *See* W.Va. Code §§ 21-5G-1 to –7 (2016).

2. *In re Estate of Reilly*, 933 A.2d 830, 834-35 (D.C. 2007).

3. *Id.* (emphasis added).

review. The majority purports to remand this case, but in fact so completely resolves the underlying constitutional issues that it renders such remand nothing but a perfunctory exercise.

This appeal of the temporary injunction should have been treated as a petition for a writ of mandamus to require the lower court to issue a ruling. I would have granted mandamus and ordered the lower court to issue a full order and opinion within ten days.[4] We could have then expedited the appeal thereof and promptly issued a full opinion based on a complete record and full argument.

Thus, I concur that this case should be remanded, but I dissent on this Court's stunning failure to recognize our jurisdictional limits in that they so explicitly resolved the underlying constitutional issues in the context of the review of a mere preliminary injunction prior to full hearing and the entry of an order below capable of full review.

Justice Franklin D. Cleckley emphasized during his tenure on this Court that our first obligation when reviewing a circuit court's decision is to articulate the standard of review—i.e., our criterion for assessing the validity of the circuit court's ruling. "This requirement serves two functions: it informs the parties of the extent of the review and, most important, reminds the appellate court

of the limitations placed on its own authority by the appellate process."[5] However complex the issues, "the standard of review is the compass that guides the appellate court to its decision. It defines and limits the course the court follows in arriving at its destination. Deviations from the path, whether it be one most or least traveled, leave writer and reader lost in the wilderness."[6]

An overwhelming body of law in this country supports the proposition that, in the appeal of an interlocutory order, the scope of appellate review is strictly confined to the issues necessary to determine the propriety of the interlocutory order itself.[7] Thus, the jurisdiction of this Court is limited to determining whether the circuit court abused its discretion in granting a preliminary injunction. "A preliminary injunction is a provisional remedy. Its function is not to determine the ultimate rights of the parties, but to maintain the status quo until there can be a full hearing on the merits."[8] The fundamental purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve ... [a] court's ability to render a meaningful decision on the merits."[9] Thus, it is essential for this Court to refrain from offering its view of the ultimate merits of the parties' arguments to allow the circuit court the latitude to make those rulings in the first instance.[10]

4. See W.Va. R. App. P. 2 ("In the interest of expediting decision, or for other good cause shown, the Supreme Court may suspend the requirements or provisions of any of these Rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction. These Rules shall be construed to allow the Supreme Court to do substantial justice."); see generally GMS Mine Repair & Maint., Inc. v. Miklos, 238 W.Va. 707, 798 S.E.2d 833 (2017) (considering appeal of interlocutory order as petition for writ of prohibition); State ex rel. Register-Herald v. Canterbury, 192 W.Va. 18, 19 n.1, 449 S.E.2d 272, 273 n.1 (1994) ("In this case, it is logical to treat the appeal filed by Mr. Thomas as a prohibition since it challenges the scope of the injunction entered by the circuit court.").

5. North Fla. Women's Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 626 (Fla. 2003).

6. People v. Jackson, 128 Cal.App.4th 1009, 27 Cal. Rptr. 3d 596, 601 (2005)

7. See Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure Volume 7, § 3291.1 (2d.ed. 2011) ("Ordinarily the scope of appellate review ... is confined to the issues necessary to determine the propriety of the interlocutory order itself.").

8. Pamela Equities Corp. v. 270 Park Ave. Café Corp., 62 A.D.3d 620, 881 N.Y.S.2d 44, 45 (2009) (internal quotation marks and citation omitted).

9. Mississippi Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 627 (5th Cir. 1985).

10. See Christian Schmidt Brewing Co. v. G. Heileman Brewing Co., 753 F.2d 1354, 1356 (6th Cir. 1985) ("An appellate court in reviewing the propriety of a preliminary injunction should refrain from the unnecessary comment on the evidence or review of the merits of the case since the case has yet to be heard in full on the merits."); DiLucente Corp. v. Pa. Roofing Co., 655 A.2d 1035, 1037-38 (Pa. Super. 1995) ("When reviewing the denial of a preliminary injunction, this Court will not inquire into the merits of a contro-

Yet the majority—without a dispositive order by the circuit court on the petition for declaratory relief—steamrolls over our jurisdictional limits in resolving these significant constitutional issues.

The urgency of the Petitioners to have a final ruling is understandable. And certainly it is troubling that this matter has been ripe for decision by the circuit court since December of 2016. Perhaps that is why the majority felt so emboldened to ignore the limits of our jurisdiction and resolve the entire case immediately under the guise of reviewing a preliminary injunction.

A review of the procedural history reflects that on June 27, 2016, the Respondents filed the petition for a preliminary injunction and declaratory relief in the circuit court of Kanawha County. On February 24, 2017, after a hearing on the petition for injunctive relief, the Honorable Jennifer Bailey entered an order temporarily enjoining the enforcement of the statute. Although the order contained some discussion of the underlying constitutional issues, the court did not resolve them fully or in anything other than a cursory and preliminary fashion. Instead, the court set a date for full briefing and argument of those issues. After conducting a hearing on the parties' motions for summary judgment in the declaratory judgment action in December of 2016, the circuit court has yet to make a decision.

During this long delay, the Petitioners have had at their command the office of mandamus, which is the proper remedy to compel tribunals and officers exercising discretionary and judicial powers to act when they unreasonably neglect or refuse to do so,[11] but they failed to use that tool. Instead, on February 27, 2017, they filed an appeal of the circuit court's preliminary injunction and made a motion for expedited relief before this Court.

In an insightful presentation on United States Supreme Court Justice Ruth Bader Ginsburg's approach to judicial decision-making, Justice Peter J. Rubin[12] cited Justice Ginsburg strong view that appellate courts must be attentive to their proper role. He also pointed out that Justice Ginsburg's jurisprudence is animated by recognition that an appellate court must refrain from adopting a position that has not been tested "in the crucible of the adversary process[.]"[13] Issues that are fully pled, briefed, argued, and decided in the first instance by a lower court not only provide the jurisdictional basis for appellate court review, but well-serve the process that the creators of our system foresaw. That is how our system is set up, and no matter how controversial or politically charged an issue is, that is how cases should be decided. This Court should not do an end-run around a pending declaratory judgment action involving constitutional issues by resolving all the issues pending below without the benefit of full proceedings and a ruling from the circuit court. "Furthermore, principles of judicial restraint counsel against addressing issues—particularly constitutional issues—which are not squarely ... before the court."[14]

The majority examines, discusses, and makes significant legal statements on the standard for granting injunctive relief. Importantly, however, they never enunciate a new syllabus point of law on the proper standard, despite the fact that our State jurisprudence has no existing syllabus points relating to the proper criteria for preliminary injunctive relief. This Court has stated that

[t]he customary standard applied in West Virginia for issuing a preliminary injunction is that a party seeking the temporary relief must demonstrate by a clear

---

versy, but will examine the record to determine if any apparently reasonable grounds exist for the trial court's action.").

**11.** *See State ex rel. State v. Reed*, 204 W.Va. 520, 514 S.E.2d 171 (1999).

**12.** Associate Justice Rubin serves on the Massachusetts Appeals Court; he is a Professor of Law at Georgetown University.

**13.** *See* Peter J. Rubin, *Keynote Address: Justice Ruth Bader Ginsburg: A Judge's Perspective,* 70 Ohio St. L.J. 825, 832 (2009).

**14.** *Florida Carry, Inc. v. Univ. of N. Fla.,* 133 So.3d 966, 981 (Fla. Dist. Ct. App. 2013) (Wetherell, J., concurring).

showing of a reasonable likelihood of the presence of irreparable harm; the absence of any other appropriate remedy at law; and the necessity of a balancing of hardship test including: "(1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest." *Jefferson County Bd. of Educ. v. Jefferson County Educ. Ass'n,* 183 W.Va. 15, 24, 393 S.E.2d 653, 662 (1990) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048, 1054 (4th Cir.1985))[.][15]

In *Jefferson County,* we stated that courts must consider these factors in "flexible interplay" when determining whether to issue a preliminary injunction, which seems to suggest a movant must make a showing on all factors and the court has discretion in weighing them.[16] While the factors set forth in *Jefferson County* have become the apparent standard in West Virginia, we have not adopted them in a syllabus point. Because the preliminary injunction is an extraordinarily powerful remedy, the majority drops the ball badly by setting forth constitutional conclusions while failing to even clarify our standard for a preliminary injunction. The

fact that there are substantial differences in the law governing the proper standard of review of a preliminary injunction in both state[17] and federal courts[18] should have also impelled the majority to put these issues through that "crucible of the adversarial process."

While the Respondents clearly have an uphill battle to demonstrate that this legislation is unconstitutional, both parties deserve to have the merits of their claims fully adjudicated below, and to have a full review by this Court of a full and complete order on the petition for declaratory relief before this Court rushes to judgment.

Thus, I concur that this case should be remanded, but I dissent on this Court's stunning failure to recognize our jurisdictional limits in explicitly resolving constitutional issues in the context of the review of a preliminary injunction with no entry of an order below capable of full review.

Davis, Justice, dissenting:

(Filed October 2, 2017)

It is well-established that:

"[t]he designation of a union as exclusive representative carries with it great re-

---

15. *State ex rel. McGraw v. Imperial Mktg.,* 196 W.Va. 346, 352 n.8, 472 S.E.2d 792, 798 n.8 (1996).

16. *Jefferson County,* 183 W.Va. at 24, 393 S.E.2d at 662; *see also Horton v. City of St. Augustine,* 272 F.3d 1318, 1326 (11th Cir. 2001) (stating it is well established that preliminary injunction is extraordinary and drastic remedy not to be granted unless movant clearly establishes burden of persuasion as to all elements).

17. *See* Richard R.W. Brooks & Warren F. Schwartz, *Legal Uncertainty, Economic Efficiency, and the Preliminary Injunction Doctrine,* 58 Stan.L.Rev. 381, 389-90 (2005) ("Most courts, when deciding whether to grant an injunction, rely on a four-part standard that (to varying degrees) considers (1) plaintiff's likelihood of success on the merits, (2) the amount of irreparable harm likely in the absence of the injunction, (3) a balancing of expected harms to plaintiff and those to defendant, and (4) the public interest. Within the jurisdictions that use this four-part standard, there is no uniform application. Courts outside these jurisdictions apply entirely different standards that may, for example, limit consideration to a combination of plaintiff's probable

success on the merits and her irreparable harm or a balance of hardships that favors plaintiff.") (footnotes omitted).

18. *See* Thomas R. Lee, *Preliminary Injunctions and the Status Quo,* 58 Wash. & Lee L. Rev. 109, 110 (2001) ("The federal courts of appeals are in substantial disarray on an issue of threshold importance to the issuance of preliminary injunctive relief. One set of circuits says that the traditional role of such relief is the preservation of the 'status quo,' and thus accords disfavored status to preliminary orders that are mandatory in form or that otherwise upset the status quo. In these circuits, a party seeking a preliminary injunction must satisfy a heightened standard of proof requiring a clear and compelling showing of the propriety of such relief. Another set of circuits rejects this view. These circuits apply a uniform standard to all requests for preliminary relief."); Rachel A. Weisshaar, *Hazy Shades of Winter: Resolving the Circuit Split over Preliminary Injunctions,* 65 Vand.L.Rev. 1011, 1014-15 (2012) (discussing split of authority among federal district courts as to proper standard following United States Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

sponsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, *the union is obliged fairly and equitably to represent all employees ...; union and nonunion, within the relevant unit.*"

*Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 552-53, 111 S. Ct. 1950, 1976, 114 L.Ed. 2d 572 (1991) (Scalia, J., concurring, in part, and dissenting, in part) (emphasis added) (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 221-22, 97 S. Ct. 1782, 1792-93, 52 L.Ed. 2d 261 (1977) (additional quotations and citations omitted; footnote omitted)). The majority's misapprehension of the realities of the collective bargaining process notwithstanding,[1] the Respondent unions herein acknowledge and embrace their duty of fair representation and neither shirk nor deny their responsibility to union and nonunion members alike.

In its opinion, the majority opines that the case *sub judice* raises concerns of fairness. This is an absolutely correct statement of the issues underlying the instant proceeding because the Respondent unions rightfully question how it can be fair that they are *required* to expend time and resources to ensure that nonunion members are equally represented while those same nonunion members are allowed a *free ride*[2] to benefit from the union's collective bargaining activities without having to contribute to the cost of providing such services.[3] Indeed, there exists

> a correlation between the rights and duties of the union, on the one hand, and the nonunion members of the bargaining unit, on the other. Where the state imposes upon the union a duty to deliver services, it may permit the union to demand reimbursement for them; or, looked at from the other end, *where the state creates in the nonmembers a legal entitlement from the union, it may compel them to pay the cost.*

*Lehnert*, 500 U.S. at 556, 111 S. Ct. at 1978, 114 L.Ed. 2d 572 (Scalia, J., concurring, in part, and dissenting, in part) (emphasis added). This *quid pro quo* arrangement, condoned by Congress and secured by constitutional protections, seeks to promote the dual interests of unions in providing collective bargaining services to all employees without regard for union membership and of employees in choosing not to become union members, while ensuring that all employees bene-

---

1. My brethren suggest that the Respondent unions, themselves, have created the problem which they now ask the judiciary to solve by declaring the subject statutory scheme unconstitutional insofar as the unions, themselves, have sought the coveted position as exclusive representative of their employees, and, thus, necessarily have incurred and assumed the expenses attributed to the free-riding nonunion employees. This brief summation of the majority's understanding of the issue demonstrates an inordinate lack of comprehension of basic tenets of labor law: the election of an exclusive union representative is a matter of necessity, not of choice. But for the existence of an exclusive union representative to facilitate negotiations, there would be no collective bargaining agreement to reconcile and govern the often divergent and discordant interests of employers and employees in the first instance, and the entire statutory scheme at issue herein, which seeks to regulate such union activities, would be a mere nullity.

2. The term "free rider" refers to nonunion members who nevertheless are represented by their unit's exclusive representative union: "'the free rider Congress had in mind was the employee the union was required to represent and from whom it could not withhold benefits obtained for its members.'" *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 552-53, 111 S. Ct. 1950, 1976, 114 L.Ed. 2d 572 (1991) (Scalia, J., concurring, in part, and dissenting, in part) (quoting *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Emps.*, 466 U.S. 435, 452, 104 S. Ct. 1883, 1894, 80 L.Ed. 2d 428 (1984)).

3. To this end,

> [u]nder th[e] [fair representation] doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca v. Sipes*, 386 U.S. 171, 177, 87 S. Ct. 903, 910, 17 L.Ed. 2d 842 (1967) (citation omitted).

**650**

fitting from such services share in the cost of their provision.

Nevertheless, while the majority astutely recognizes that matters of public policy are within the realm of the Legislature, it fails to appreciate that matters of constitutionality squarely reside in the judicial branch of government. By this I mean that while statutes must be read so as to conform to the constitution where possible,[4] it is not the Court's province to contort the law to achieve a finding of constitutionality by resorting to "disingenuous evasion" to achieve a result that clearly is contrary to legislative intent. *Communications Workers of Am. v. Beck,* 487 U.S. 735, 762, 108 S. Ct. 2641, 2657, 101 L.Ed. 2d 634 (1988) (internal quotations and citations omitted). In establishing the federal framework within which the instant controversy is reposed, the majority stops short of considering the law governing the resolution of the issue herein presented, concluding succinctly that, "[i]n sum, *under federal law, states may decide whether to allow or prohibit employers and unions to negotiate agreements* requiring compulsory union membership, or *requiring nonunion employees to pay dues or fees to the union.*" (Emphasis added). Because the majority fails to consider the applicable federal law, however, it inevitably misconstrues the limitations on states' authority to regulate union activity and ignores the clear recognition that *Congress, not the states,* has defined the extent to which a nonunion employee may be required to pay representational fees to a union. In light of these shortcomings in the majority's opinion, I respectfully dissent.

### *Preemption*

Congress enacted the Labor Management Relations Act ("LMRA")[5] to provide uniformity and predictability in the field of labor law by establishing the permissible bounds of relationships between unions, employers, and employees. " '[I]n passing the NLRA[6] Congress largely displaced state regulation of industrial relations,' and thus, states 'may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.' " *Simms v. Local 1752, Int'l Longshoremen Ass'n,* 838 F.3d 613, 617 (5th Cir. 2016) (quoting *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.,* 475 U.S. 282, 286, 106 S. Ct. 1057, 1061, 89 L.Ed. 2d 223 (1986)) (footnote added; additional citation omitted). Section 8(a)(3) of the LMRA precludes compulsory union membership as a condition of hiring for employment, but still allows employers and unions to enter agreements to require, as a condition of continued employment, employees to join a union after they have been employed for a specified period of time. *See generally* 29 U.S.C. § 158(a)(3). The validity of such an arrangement, while permitted under *federal* law, may nevertheless be altered by the exercise of a state's authority to determine whether such compulsory union membership may be required under *state* law. *See* 29 U.S.C. § 164(b) ("§ 14(b)").

Despite Congress' grant of such authority to the states, however, the United States Supreme Court consistently has recognized that free riders, *i.e.,* nonunion members who enjoy the benefits of a union's collective bargaining activities through the union's duty of fair representation but who, as nonunion members, do not correspondingly pay union dues to reimburse the cost of the union's provision of such services, have an "obligation to support union activities ... germane to collective bargaining, contract administration, and grievance adjustment." *Beck,* 487 U.S. at 745, 108 S. Ct. at 2648, 101 L.Ed. 2d 634. In this regard, the Supreme Court has recognized that "Congress authorized compulsory unionism only to the extent necessary to ensure that those who enjoy union-negotiated benefits contribute to their cost," *id.,* 487 U.S. at 746, 108 S. Ct. at 2649,

---

4. *See Frantz v. Palmer,* 211 W. Va. 188, 194, 564 S.E.2d 398, 404 (2001) (recognizing Court's "obligation to respect the legislative will and to uphold all constitutionally valid legislative provisions" (citation omitted)); *State ex rel. City of Charleston v. Coghill,* 156 W. Va. 877, 883, 207 S.E.2d 113, 118 (1973) ("Acts of the Legislature are always presumed to be constitutional, and this Court will interpret legislation in any reasonable way which will sustain its constitutionality.").

5. This Act is also known as the Taft-Hartley Act.

6. The NLRA, *i.e.,* National Labor Relations Act, is the predecessor to the LMRA.

101 L.Ed. 2d 634, "but the 'membership' that may be so required has been 'whittled down to its financial core.'" *Id.*, 487 U.S. at 745, 108 S. Ct. at 2648, 101 L.Ed. 2d 634 (quoting *National Labor Relations Bd. v. General Motors Corp.*, 373 U.S. 734, 742, 83 S. Ct. 1453, 1459, 10 L.Ed. 2d 670 (1963)). Stated otherwise, "'Congress' decision to allow union-security agreements at all reflects its concern that ... the parties to a collective bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them,'" [7] by "ensuring that nonmembers who obtain the benefits of union representation can be made to pay for [their fair share of] them."[8]

Having recognized these corresponding rights and obligations of unions and free-rider nonunion members, it is important to note that the United States Supreme Court *has not declared* that the authority of states to determine their own parameters of union membership extends so far as to require unions to undertake their duty to fairly represent nonunion free riders on a *gratis* basis. And, it further should be noted that this is the foundational context within which Senate Bill 1 was promulgated—not the incomplete historical framework recited in the majority's opinion that completely and conveniently ignores the corollary duty of nonunion members to pay for the services the unions are obligated to provide them.

In light of Congress' intent to permit unions to recoup representational fees from nonunion members and to negotiate with employers to incorporate such terms in collective bargaining agreements, it is clear that the specific terms of such an arrangement must be decided with respect to *federal*, not state, law in the interest of preserving the uniform and predictable enforcement of collective bargaining agreements. "Preemption under the LMRA is grounded in substantial part on the desire for uniformity in the interpretation of labor contracts." *General Motors*

*Corp. v. Smith*, 216 W. Va. 78, 88, 602 S.E.2d 521, 531 (2004) (per curiam) (Maynard, C.J., dissenting). In other words,

> [t]he interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law....

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211, 105 S. Ct. 1904, 1911, 85 L.Ed. 2d 206 (1985). As such, "[t]he governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 246, 79 S. Ct. 773, 780, 3 L.Ed. 2d 775 (1959) (footnote omitted). Thus, "[i]t is federal law alone that defines the relationship between the parties to a labor contract, and '[a] state rule that purports to define the meaning or scope of a term in [such] a contract' is preempted." *Lowe v. Imperial Colliery Co.*, 180 W. Va. 518, 523, 377 S.E.2d 652, 657 (1988) (quoting *Allis-Chalmers*, 471 U.S. at 210, 105 S. Ct. at 1911, 85 L.Ed. 2d 206).

Therefore, there can be no question that this area of the law has been preempted by Congress and is not a proper area within which the states may legislate. This is so because arrangements between unions and employers to charge nonunion employees with their proportionate share of the union's collective bargaining expenses necessarily are achieved through the collective bargaining process, itself, and the interpretation of specific terms of a collective bargaining agreement is subject to federal law to ensure

---

**7.** *Communications Workers of Am. v. Beck*, 487 U.S. 735, 750, 108 S. Ct. 2641, 2651, 101 L.Ed. 2d 634 (1988) (quoting *Oil, Chem. & Atomic Workers, Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 416, 96 S. Ct. 2140, 2144, 48 L.Ed. 2d 736 (1976)).

**8.** *Beck*, 487 U.S. at 759, 108 S. Ct. at 2656, 101 L.Ed. 2d 634.

consistency in the construction and enforcement of such agreements. *See* Syl. pt. 4, *Greenfield v. Schmidt Baking Co., Inc.*, 199 W. Va. 447, 485 S.E.2d 391 (1997) ("An application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), only if such application requires the interpretation of a collective-bargaining agreement."). *See also* Syl. pt. 1, *Cutright v. Metropolitan Life Ins. Co.*, 201 W. Va. 50, 491 S.E.2d 308 (1997) ("The Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law."); Syl. pt. 4, *Lowe*, 180 W. Va. 518, 377 S.E.2d 652 ("While Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1947), does not divest state courts of jurisdiction in labor cases, *the federal labor law is supreme* and is to be applied by state and federal courts alike. *State law to the contrary is preempted.*" (emphasis added)). Accordingly, it is clear that Senate Bill 1's prohibition of the charging of representational agency fees to nonunion members is an invalid exercise of the State's legislative power given that this particular area of the law has been preempted. To the extent that the majority has upheld this proposed statutory language, it was wrong, and from that decision, I dissent.

### Constitutionality

Assuming *arguendo* that the subject provision has not been invalidated by federal preemption, the promulgation adopted by the Legislature still cannot stand because it is unconstitutional under both the federal and State constitutions as an unlawful taking of private property. The Fifth Amendment to the United States Constitution, also known as the Takings Clause, prohibits the taking of private property without just compensation therefor. "The Takings Clause provides that 'private property [shall not] be taken for public use without just compensation.' U.S. Const. amend. V." *International Union of Operating Eng'rs Local 370 v. Wasden*, 217 F. Supp. 3d 1209, 1223 (D. Idaho 2016) (mem. decision). Likewise, article III, § 9 of the West Virginia Constitution also precludes the unlawful seizure of property: "Private property shall not be taken or damaged for public use, without just compensation[.]" *Id.*

In the case *sub judice*, the position that the Legislature proposes, and which the majority of the Court endorses, would require unions serving as an exclusive representative to equally serve union and nonunion members alike in their pursuit of collective bargaining activities and their provision of services attendant thereto, while permitting free-riding, nonunion members to enjoy such benefits without paying a single dime for them. Unquestionably, such free riders would be unjustly enriched while both the unions and their dues-paying members would be unduly, and unfairly, punished by the necessity of absorbing the costs associated with the free riders' representation, which costs inevitably would trickle down from the union's incursion thereof to the countless union members required to subsidize their free-riding coworkers. Moreover, this proposed, and endorsed, arrangement directly contravenes the constitutional prohibitions of taking one's private property both without just compensation and for a private use:

> The two most basic economic rights enjoyed in the United States are (1) that the government may not confiscate private property for public use without just compensation, and (2) that the takings power must be exercised for a public purpose, and so the government may not take the property of one private party for the sole purpose of transferring it to another private party, regardless of whether "just" compensation is paid.

*Sweeney v. Pence*, 767 F.3d 654, 683 (7th Cir. 2014) (Wood, C.J., dissenting) (citing *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 477, 125 S. Ct. 2655, 2661, 162 L.Ed. 2d 439 (2005)). *Accord Riggs v. State Rd. Comm'r*, 120 W. Va. 298, 301, 197 S.E. 813, 814 (1938) (" 'Private property shall not be taken or damaged for public use, without just compensation....' West Virginia Constitution, Article III, Section 9. It is imperative that this paramount provision of our organic law be given effect."); Syl. pt. 1, *Hench v. Pritt*, 62 W. Va. 270, 57 S.E. 808 (1907) ("Under our Constitution private property cannot be taken for private use, either with or without compensation.").

Absent the ability to seek such contributions from free riders, unions are expected to continue providing their collective bargaining services with no recourse for seeking recoupment of their costs of providing such representation. Legally requiring exclusive representative unions to expend such resources while foreclosing their ability to obtain remuneration therefor amounts to an unlawful, and unconstitutional, taking of private property plain and simple. The unconstitutionality of this arrangement could not be clearer, and, yet, the majority blithely ignores the impudence and inequities attendant to such a scheme, instead blaming the unions for complaining about the representational duties they have agreed to assume. Just because a union voluntarily agrees to assume or willingly seeks the title of exclusive representative, however, does not mean that it should be forced to provide its collective bargaining services free of charge. As exclusive bargaining agents between employers and employees, Congress has recognized the valuable role unions play in creating and maintaining harmonious workplaces and working environments in our country. *See generally Sweeney*, 767 F.3d at 684 (Wood, C.J., dissenting) (discussing benefits from exclusive representative unions enjoyed by employers). That unions accept the responsibilities of exclusive representative status is of no moment. That free-riding nonunion members are being excused from paying their fair share of the union's collective bargaining expenses that have inured to the free riders' benefit is the problem—which the majority declines to acknowledge, much less redress.

In short, the majority's failure to recognize these fatal deficiencies of Senate Bill 1 demonstrates its blatant lack of appreciation for the sanctity of basic constitutional protections guaranteed by the Bill of Rights. "In our country, the state is not entitled to force private organizations or persons to render uncompensated services to others. The Takings Clause, which applies to the states, says as much." *Sweeney*, 767 F.3d at 684-85 (Wood, C.J., dissenting). Yet, because exclu-

sive representative unions have an obligation to represent *all* employees in a workplace fairly and without regard for their union membership or affiliation, and the majority has failed to understand that there exists a corollary right to expect nonunion member free riders to bear their proportionate share of the cost of the union's collective bargaining activities, the right to be free from the unfettered taking of one's property no longer is a right guaranteed by the laws of this State. Because the preclusive effect of Senate Bill 1 leaves unions with no ability to enforce the corollary duty of free-riding nonunion members to pay for the services which the unions are obligated to provide to them, and because the majority has upheld the validity of this provision despite its blatant unconstitutionality, I respectfully dissent.

### *Injunctive Relief*

The foregoing analysis of the validity of Senate Bill 1 is essential because it is instructive to the resolution of the pivotal issue presented by the case *sub judice:* are the Respondent unions entitled to the injunctive relief they herein seek. Whether such a determination is made pursuant to the authorities cited in the majority's opinion [9] or according to the standard urged by Justice Workman in her separate opinion,[10] the result should be the same: the Respondents undeniably have established their entitlement to a preliminary injunction to prevent the enforcement of Senate Bill 1 because the Respondent unions have demonstrated the likelihood of success on the merits of their underlying complaint.

Moreover, with respect to the Respondent unions' unconstitutional taking argument, this Court specifically has held that "[a]n injunction lies to prevent the taking of one's private domain, for uses of the public, contrary to the constitutional mandate, regardless of any question of damages." Syl. pt. 3, *Lovett v. West Virginia Cent. Gas Co.*, 65 W. Va. 739, 65 S.E. 196 (1909). *Accord International Union of Operating Eng'rs Local 139 v. Schimel*, 863 F.3d 674, 678 n. 2 (7th Cir.

---

**9.** *See Jefferson Cty. Bd. of Educ. v. Jefferson Cty. Educ. Ass'n*, 183 W. Va. 15, 393 S.E.2d 653 (1990); Syl. pt. 4, *State ex rel. Donley v. Baker*, 112 W. Va. 263, 164 S.E. 154 (1932).

**10.** *See, e.g., State of West Virginia, By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 472 S.E.2d 792 (1996).

2017) ("It is well accepted that, when the government has taken property for a private, rather than a public, use, injunctive or declaratory relief may be appropriate." (internal quotations and citations omitted)). *See also* Syl. pt. 4, *Lovett*, 65 W. Va. 739, 65 S.E. 196 ("A question of right, and not one of damages, is raised upon an application for an injunction to prevent the taking of private property for public uses contrary to the Constitution and laws.").

I acknowledge that Congress has granted the states authority to enact laws regulating union activities within their borders. *See generally* 29 U.S.C. § 164(b). However, such grant of authority does not permit states, including West Virginia, to promulgate legislation that is patently unconstitutional. Even the United States Supreme Court has recognized this limitation on states' power. *See Lincoln Fed. Labor Union No. 19129, Am.*

*Fed'n of Labor v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536, 69 S. Ct. 251, 257, 93 L.Ed. 212 (1949) ("[S]tates have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, *so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.*" (emphasis added; citations omitted)). This Court, however, obviously has not, and, because the majority has complicitly condoned these legislative efforts to trammel the rights of unions and union members throughout this State, I respectfully dissent.